Thomas Allen OLSON

v.

Carlton V. THURSTON, and State
of Maine.

Supreme Judicial Court of Maine.

Nov. 2, 1978.

Paine & Lynch by Martha J. Harris, Ban-
gor (orally), for plaintiff.

William R. Stokes (orally), Charles K. Leadbetter, Asst. Attys. Gen., Augusta, for defendants.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

McKUSICK, Chief Justice.

On appeal from the Superior Court's denial of his petition for a writ of habeas corpus, Thomas Allen Olson seeks to prevent his extradition to Pennsylvania, where he stands charged with burglary, theft, and receiving stolen property. We deny the appeal.

Acting upon reasonable information that Olson was a fugitive from justice, police officers in Maine on November 18, 1977, arrested him, without a warrant. Following the procedure set forth in the Uniform Criminal Extradition Act, 15 M.R.S.A. §§ 201–229,[1] Olson was arraigned three days later in the Maine District Court.[2] The District Court, however, failed to comply with section 215 of the Act requiring the judge to ascertain whether Olson was the person charged with the Pennsylvania crime. Nor did the court set a specific limit on the period for which Olson could be detained pending the issuance of an interstate rendition warrant by Governor Longley of Maine.[3] Unable to make bail, Olson remained incarcerated until December 21, 1977, when bail was reduced and Olson released.

On December 9, 1977, Governor Shapp of Pennsylvania forwarded a request to Governor Longley, demanding that Olson be extradited from Maine to Pennsylvania. Requisite documentation in support of the demand, however, was not delivered to the Governor of Maine until about a month later. The District Court granted continuances on November 30, 1977, December 14, 1977, December 21, 1977, and January 11, 1978, while awaiting the Governor's issuance of the rendition warrant. On January 18, 1978, Governor Longley issued a rendition warrant for Olson's arrest and extradition, which was executed on January 23, 1978. Four days later Olson petitioned

1. Unless otherwise noted, all citations herein of the Uniform Criminal Extradition Act refer to the statute as it stood at the time of Olson's arrest and habeas hearing. The act has since been substantially amended. P.L.1978, ch. 671, eff. July 6, 1978.

2. Section 213 provided in part:
 "Whenever any person within this State shall be charged on the oath of any credible person before any judge or magistrate of this State with the commission of any crime in any other state, and . . . with having fled from justice . . . the judge or magistrate shall issue a warrant directed to any peace officer commanding him to apprehend the person named therein, wherever he may be found in this State, and to bring him before the same or any other judge, magistrate or court who or which may be available in or convenient of access to the place where the arrest may be made, to answer the charge or complaint and affidavit, and a certified copy of the sworn charge or complaint and affidavit upon which the warrant is issued shall be attached to the warrant."
 Although Olson was arrested without a warrant, such procedure was authorized by 15 M.R.S.A. § 214, which provided:
 "The arrest of a person may be lawfully made by an officer or a private citizen without a warrant, upon reasonable information that the accused stands charged in the courts of another state with a crime punishable by death or imprisonment for a term exceeding one year; but when so arrested, the accused must be taken before a judge or magistrate with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in section 213. Thereafter his answer shall be heard as if he had been arrested on a warrant."

3. Section 215 stated:
 "If, from the examination before the judge or magistrate, it appears that the person held is the person charged with having committed the crime alleged and that he probably committed the crime, and, except in cases arising under section 206, that he has fled from justice, the judge or magistrate must commit him to jail by a warrant reciting the accusation for such a time specified in the warrant as will enable the arrest of the accused to be made under a warrant of the Governor on a requisition of the executive authority of the State having jurisdiction of the offense, unless the accused gives bail as provided in section 216, or until he shall be legally discharged."
 The Superior Court held that the failure by the State to observe the statutory requirements of section 215 was rendered moot by the subsequent arrest of petitioner Olson under the Governor's rendition warrant.

for a writ of habeas corpus in the Superior Court pursuant to 15 M.R.S.A. § 210.[4] The Superior Court denied his petition, and Olson brought a timely appeal to this court.

Before this court on appeal, as before the Superior Court, Olson asserts three reasons why he believes he should not be extradited to Pennsylvania. First, he contends that the documentation accompanying Pennsylvania's extradition request failed to satisfy the statutory requirements of 15 M.R.S.A. § 203. Second, he alleges that before he can be extradited on Pennsylvania's request, Maine courts are constitutionally obligated to make their own independent determination that probable cause exists to believe that Olson has committed a crime, without relying on a probable cause determination made by a Pennsylvania justice. Finally, he argues that the conceded illegality of his earlier detention before the issuance of Governor Longley's rendition warrant taints the entire extradition procedure, and that consequently his extradition to Pennsylvania would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Superior Court correctly rejected each of petitioner's arguments, and consequently we deny his appeal.

### Pennsylvania Documentation Supporting its Demand for Extradition

On August 5, 1977, Detective George Boone of the Lower Merion Police Department personally appeared before Justice Robert P. Johnson of Montgomery County District Court in the Commonwealth of Pennsylvania and swore to a complaint charging Olson with the offenses of theft, burglary, and receiving stolen property.[5] Justice Johnson thereupon issued a warrant for Olson's arrest, certifying that "there is probable cause for the issuance of process," and that Detective Boone had "personally appeared" before him and that Boone under oath stated "that the facts set forth [in the complaint were] true and correct to the best of [his] knowledge, information and belief." The executed complaint and the arrest warrant issued by Justice Johnson were attached to Governor Shapp's extradition request and forwarded to the Governor of Maine. Olson contends that this documentation failed to satisfy the statutory requirements of 15 M.R.S.A. § 203. That section provided in part:

"No demand for the extradition of a person charged with crime in another state shall be recognized by the Governor unless . . . said demand shall be accompanied by a copy of an indictment found, or information, supported by affidavit in the state having jurisdiction of the crime, *or by a copy of an affidavit made before a magistrate in such state, together with a copy of any warrant which was issued thereupon* . . . .

---

4. The right to habeas corpus review before extradition was provided for by section 210 of the Uniform Criminal Extradition Act:

"No person arrested upon such warrant shall be delivered over to the agent whom the executive authority demanding him shall have appointed to receive him, unless he shall first be taken forthwith before a judge of a court of record in this State, who shall inform him of the demand made for his surrender and of the crime with which he is charged and that he has the right to demand and procure legal counsel. If the prisoner or his counsel shall state that he or they desire to test the legality of his arrest, the judge of such court of record shall fix a reasonable time to be allowed him within which to apply for a writ of habeas corpus. When such writ is applied for, notice thereof and of the time and place of hearing thereon shall be given to the prosecuting officer of the county in which the arrest is made and in which the accused is in custody and to the said agent of the demanding state."

5. The allegations contained in the complaint read:

"The actor did forcibly enter the residence of Harry Williams, 313 Clairmont Rd., Villanova, Penna., and he unlawfully and feloniously entered the residence of said Harry Williams with the intent to commit the specific crime of burglary and theft therein, and did steal and carry away United States currency, jewelry, and a 1972 Oldsmobile cpe., bearing Penna. registration P44766, the total approximately value of $6,125.00, with the intent of depriving the lawful owner, Harry Williams, thereof, and did receive and retain said property knowing the same had been stolen, making no attempt to return same to it's [sic] lawful owner."

The indictment, information or affidavit made before the magistrate must substantially charge the person demanded with having committed a crime under the law of that state. The copy of indictment, information, affidavit . . . must be authenticated by the executive authority making the demand." (Emphasis added)

Olson maintains that the executed complaint is not the equivalent of "an affidavit made before a magistrate" within the meaning of the statute.[6]

■ This portion of the Maine version of the Uniform Criminal Extradition Act parallels the federal statute [7] which implements art. IV, § 2, clause 2 of the United States Constitution.[8] *Sawyer v. State,* Me., 382 A.2d 1039, 1041–42 (1978). On a petition for habeas corpus, it is incumbent upon the court to review the warrants of arrest and of requisition to determine whether they comply with the statutes and justify the rendition warrant. *Poulin v. Bonenfant,* Me., 251 A.2d 436, 438 (1969). Though the issue of whether a "complaint" constitutes an "affidavit" under the statute has not previously been addressed by this court, we are particularly alert to the fact that the Maine legislature has mandated that

the Uniform Criminal Extradition Act " 'shall be so interpreted and construed as to effectuate its general purpose to make uniform the laws of those states which enact it.' . . . [T]he need for uniformity among the states is particularly acute in this area of the law, involving as it does principles of interstate comity under an umbrella of controlling federal law." *Sawyer v. State, supra* at 1041.

■ Bearing in mind, then, the considerable precedential value of decisions from other jurisdictions, we note that courts universally accept a criminal complaint, sworn to before a judge, as an "affidavit made before a magistrate" within the meaning of both the Uniform Criminal Extradition Act and the analogous federal statute, 18 U.S.C. § 3182.[9] Interestingly enough, Maine was the demanding state in one of the leading cases so holding—decided in Massachusetts, there the asylum state. Maine's demand for extradition was accompanied by a sworn complaint. Noting that "an affidavit is a statement in writing sworn before an officer authorized to administer an oath," the Massachusetts Supreme Judicial Court concluded: "The contention of the petitioners that a complaint cannot be an affidavit is

---

**6.** Under Pennsylvania law a complaint is a proper charging instrument by which a criminal prosecution may be initiated. Pa.R.Crim.P. 101 (Purdon's Supp.1978).

**7.** 18 U.S.C. § 3182 (1948), derived from an enactment of 1793, provides:

"Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear."

**8.** Article IV, section 2, clause 2 provides:

"A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

**9.** *Ex parte Morgan,* 78 F.Supp. 756 (D.C.Cal. 1948), *aff'd sub nom. Morgan v. Horrall,* 175 F.2d 404 (9th Cir.), *cert. denied* 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503 (1949); *Ex parte Rubens,* 73 Ariz. 101, 238 P.2d 402, *cert. denied sub nom. Rubens v. Boies,* 344 U.S. 840, 73 S.Ct. 50, 97 L.Ed. 653 (1952); *Coca v. Sheriff of City and County of Denver,* 184 Colo. 11, 517 P.2d 843 (1974); *Miles v. State,* 339 So.2d 246 (Fla.App. 1976); *In re Martz,* 83 Idaho 72, 357 P.2d 940 (1960); *People ex rel. Kubala v. Woods,* 52 Ill.2d 48, 284 N.E.2d 286 (1972); *In re Murphy,* 321 Mass. 206, 72 N.E.2d 413 (1947); *State v. Limberg,* 274 Minn. 31, 142 N.W.2d 563 (1966); *Loulakis v. Waller,* 103 N.H. 526, 176 A.2d 314 (1962); *Bell v. Corless,* 57 Utah 604, 196 P. 568 (1921).

unsound." *In re Murphy,* 321 Mass. 206, 72 N.E.2d 413, 417–18 (1947). Similarly, the Utah Supreme Court has held that were a complaint "states all of the essential facts constituting the offense, and is sworn to in positive terms," it "takes the place and answers the purposes of the affidavit referred to in the federal statute and is sufficient both in form and in substance." *Bell v. Corless,* 57 Utah 604, 196 P. 568, 571 (1921).

As the language of the Uniform Act makes clear, "[t]he indictment, information or affidavit made before the magistrate must substantially charge the person demanded with having committed a crime under the law of that State." As long as the complainant's statements before the magistrate are given under oath, it is of no relevance that the criminal accusation is described as a "complaint" rather than an "affidavit." The test remains whether the commission of a crime has been asserted by a person under oath. Detective Boone's complaint, sworn to before a justice of the Pennsylvania District Court, unambiguously charges Olson with three criminal offenses[10] and thus satisfied the statutory requirements of 15 M.R.S.A. § 203.

### *Constitutional Limitations: Probable Cause to Arrest*

"The Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention." *Gerstein v. Pugh,* 420 U.S. 103, 126, 95 S.Ct. 854, 869, 43 L.Ed.2d 54 (1975). This principle applies with equal force to the "significant pretrial restraint of liberty" involved in interstate extradition. *Ierardi v. Gunter,* 528 F.2d 929, 930 (1st Cir. 1976).

■■■ Olson is entitled to a judicial determination of probable cause prior to his extradition. But in issuing the arrest warrant, Pennsylvania District Court Justice Johnson expressly certified his determination of probable cause, and the courts of Maine are precluded from reviewing that judicial determination.

As one federal court has observed: "The question before us is not whether the probable cause defense may be raised to vitiate an arrest, but when [and where] and before which tribunal." *Garrison v. Smith,* 413 F.Supp. 747, 753 (N.D.Miss.1976). Olson argues that this court should follow the rule laid down in *Kirkland v. Preston,* 128 U.S. App.D.C. 148, 154, 385 F.2d 670 (1967). The *Kirkland* court differentiated between an extradition demand accompanied by a grand jury indictment and a demand premised on an affidavit and the arrest warrant issued thereon. The court held that in the latter situation "Fourth Amendment considerations require that before a person can be extradited . . . the authorities in the asylum state must be satisfied that the affidavit shows probable cause." *Id.* 128 U.S.App.D.C. at 154, 385 F.2d at 676.

A sounder approach in our view, however, has more recently been taken by the United States Court of Appeals for the First Circuit. That court, speaking through Judge Campbell, specifically held that the issuance of an arrest warrant by a judge in the demanding state on a finding of probable cause suffices for extradition:

"Respondents seem to assume that if a judicial determination of probable cause must precede extradition, it must be provided by the courts of the asylum state, where the fugitive is held. That is not so. . . . [N]othing in *Gerstein* prevents the demanding state from providing the requisite pre-rendition determination of probable cause. . . . Such a determination is fully consistent with reliance by the asylum state on the regularity of the demanding state's procedures. If, for example, the papers submitted by Florida were to show that a judicial officer or tribunal there had found probable cause, *Massachusetts would not need to find probable cause anew, nor would it need to review the adequacy of the Florida determination.* Instead, it would be entitled to rely on the official representation of its sister state that the requisite

---

**10.** See n. 5 above.

determination had been made; thus in our view *Massachusetts may credit an arrest warrant shown to have issued upon a finding of probable cause just as it would credit a Florida indictment."* *Ierardi v. Gunter, supra* at 930–31 (Emphasis added)

The *Kirkland* court's assertion that an arrest warrant is an unreliable determination of probable cause seems premised on the unproven assumption that in practice magistrates do not scrutinize warrant requests with an exacting eye,[11] and that they frequently fall short of the theoretical ideal articulated in *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948), of a "neutral and detached magistrate" who, unlike law enforcement officers, is not "engaged in the . . . competitive enterprise of ferreting out crime."

We see no reason to assume that judicial officers habitually fail to perform their duties in reviewing requests for arrest warrants. On the contrary, the United States Supreme Court noted in *Gerstein v. Pugh, supra,* 420 U.S. at 116 n. 18, 95 S.Ct. at 864, that "[a] person arrested under a warrant would have received a prior judicial determination of probable cause."

There may, of course, be occasions when magistrates fail to perform their constitutionally assigned task of reviewing arrest warrant requests with proper care. Arrest warrants may be issued by some magistrates who simply default and defer to the judgment of police or prosecutors, without making an independent judicial determination of probable cause. Furthermore, other magistrates who do make conscientious efforts to review arrest warrant requests with detached judicial impartiality and zeal may nevertheless, on occasion, make erroneous probable cause determinations. The question becomes not whether such judicial errors should be reviewable, but in what forum may a defendant make an attack on the validity of an arrest warrant. Arguably, if courts of asylum states were permitted to correct mistakes made by judicial officers in demanding states, a valuable safeguard against constitutional error would be provided. But the framers of the Constitution, charged with the task of forging a viable federal system, rejected that contention.

Redress of judicial errors committed in the demanding state must be obtained in the courts of the demanding state. There is but one federal Constitution, and the courts of all fifty states are bound to support and enforce it. Pennsylvania, exactly as much as Maine, must enforce the Fourth Amendment requirement of probable cause for the issuance of an arrest warrant. It is not for the courts of Maine to assume the role of the courts of Pennsylvania. After extradition to Pennsylvania, Olson will have adequate opportunity to challenge the validity of his arrest.[12] We refuse to sanction the

---

11. *Cf. People v. Doran*, 401 Mich. 235, 258 N.W.2d 406, 412 (1977), *cert. granted sub nom. Michigan v. Doran*, 435 U.S. 967, 98 S.Ct. 1604, 56 L.Ed.2d 58 (1978):

> "In this state, although the statute provides that an arrest warrant shall issue 'If it appears from such examination' that an offense has in fact been committed, the practice has not been to conduct an examination to establish probable cause."

12. In *Ierardi v. Gunter, supra*, the affidavit in support of extradition contained a statement that the allegations of an information charging breaking and entering were within the affiant's personal knowledge. In the case at bar, Detective Boone, apparently made no such statement in the complaint "affidavit"; and the record available to this court suggests that Justice Johnson may have issued the arrest warrant notwithstanding the fact that the statements made by Boone failed to meet the test set forth in *Aguilar v. Texas*, 378 U.S. 108, 114–15, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), requiring allegations that the affiant personally observed the facts alleged, or that the facts were obtained from an informant of demonstrated reliability, who had personally observed the reported facts.

It is possible that Detective Boone gave supplementary oral testimony before Justice Johnson which satisfied the *Aguilar* test. We have no record of such testimony, however, and therefore, from anything we know, the arrest warrant issued by Justice Johnson may be fatally defective. Nevertheless, it is for Pennsylvania courts, and not for courts in Maine, to adjudicate the validity of petitioner's arrest pursuant to that Pennsylvania warrant which, on its face, certifies to a judicial finding of probable cause.

disruption of our federal system by thrusting the courts of Maine into a matter properly left to the Pennsylvania judiciary.

"The traditional summary nature of extradition and the awareness of our Constitution protects equally citizens throughout the United States has led to the well established rule . . . that it is not for courts in the asylum state to inquire into the constitutionality of a sister state's criminal justice system. Thus it has been widely held . . . that courts in the asylum state are not to question whether the warrant for a fugitive's arrest is supported by probable cause." *Garrison v. Smith, supra* at 753.[13]

■ At least seven state supreme courts have rejected the *Kirkland* approach in favor of the *Ierardi* rationale.[14] Judicial appreciation for the interests of comity in transactions between states and of efficiency in bringing to justice criminals who have fled from other jurisdictions would persuade us, if we were free to choose, to prohibit Maine courts from reexamining probable cause determinations made by judicial officers in other states. The Constitution, however, does not allow us the luxury of choice. It *requires* deference to a

judicial probable cause determination made by the demanding state. Unlike considerations of comity which govern international extradition proceedings between nations, the United States Constitution mandates that any state honor the extradition demand of a sister state if that demand is supported by documentation showing that the fugitive has been "charged" with a criminal offense in a sister state.[15] Thus, Justice Catron, in a separate opinion in *Holmes v. Jennison*, 14 Pet. (39 U.S.) 540, 597, 10 L.Ed. 579 (1840), wrote:

"The uniform opinion heretofore has been, that the States on the formation of the Constitution, had the power of arrest and surrender in such cases [referring to interstate rendition]; and that so far from taking it away, the Constitution had provided for its exercise, contrary to the will of a state, in case of a refusal; thereby settling, as amongst the states, the contested question, whether on a demand, the obligation to surrender was perfect and imperative, or whether it rested on comity, and was discretionary."

In reaching our holding that Olson should press his attack upon Justice Johnson's certificate of probable cause in Pennsylvania

---

13. *Accord, Watson v. Montgomery*, 431 F.2d 1083, 1087 (5th Cir. 1970); *Woods v. Cronvich*, 396 F.2d 142, 143 (5th Cir. 1968); *Davis v. Behagen*, 321 F.Supp. 1216, 1218 (S.D.N.Y. 1970). Cf. *Gerrish v. New Hampshire*, 97 F.Supp. 527 (D.Me.1951).

14. *People v. Woods*, 52 Ill.2d 48, 284 N.E.2d 286 (1972); *Bailey v. Cox*, 260 Ind. 448, 296 N.E.2d 422 (1973); *Batton v. Griffin*, 240 Ga. 450, 241 S.E.2d 201 (1978); *Koprivich v. Warden*, 234 Md. 465, 200 A.2d 49 (1963); *Taylor v. Garrison*, 329 So.2d 506 (Miss.1976); *Smith v. Helgemoe*, 369 A.2d 218 (N.H.1977); *Wellington v. State*, 238 N.W.2d 499 (S.D.1976). Cf. *Locke v. Burns*, 238 S.E.2d 536 (W.Va.1977).

On the other hand, it is true that three state supreme courts have accepted the *Kirkland* approach. *Pippin v. Leach*, 188 Colo. 385, 534 P.2d 1193 (1975); *People v. Doran*, 401 Mich. 235, 258 N.W.2d 406 (1977), *cert. granted sub nom. Michigan v. Doran*, 435 U.S. 967, 98 S.Ct. 1604, 56 L.Ed.2d 58 (1978); *Sheriff v. Thompson*, 85 Nev. 211, 452 P.2d 911 (1969).

In addition a number of lower courts have adopted the *Kirkland* rationale. *Brode v. Power*, 31 Conn.Supp. 412, 332 A.2d 376 (Super.Ct. 1974); *United States ex rel. Mayberry v. Yeager*, 321 F.Supp. 199 (D.N.J.1971); *People ex rel. Cooper v. Lombard*, 45 A.D.2d 928, 357 N.Y. S.2d 323 (1974); *People v. Artis*, 32 A.D.2d 554, 300 N.Y.S.2d 208 (1969).

15. Chief Justice Taney observed that Article IV, section 2, clause 2, "was not a compact of peace and comity between separate nations who had no claim on each other for mutual support, but a compact binding them to give aid and assistance to each other in executing their laws, and to support each other in preserving order and law within its confines, whenever such aid was needed and required . . . ." *Kentucky v. Dennison*, 24 How. (65 U.S.) 66, 100, 16 L.Ed. 717 (1860). Thus, the Court held that the governor of the asylum state had no authority to delve into the evidence behind the extradition request of the governor of the demanding state: "[T]he certificate of the executive authority is made conclusive as to their verity when presented to the executive of the State where the fugitive is found. He has no right to look behind them, or to question them, or to look into the character of the crime specified in this judicial proceeding." *Id.* at 106.

courts, and not here in Maine, we find guidance in Supreme Court decisions on comparable fact situations. In *Sweeney v. Woodall*, 344 U.S. 86, 73 S.Ct. 139, 97 L.Ed. 114 (1952), the Court approved of the refusal of state courts in Ohio, the asylum state, to consider the merits of a petitioner's constitutional claim that Alabama prison conditions constituted cruel and unusual punishment. The petitioner, who had escaped from prison in Alabama, was arrested in Ohio. He sought to block his extradition to Alabama on the grounds that his extradition would result in a continuing violation of the 8th and 14th amendments to the United States Constitution. The Ohio Court of Common Pleas, having jurisdiction over the extradition proceeding, refused to consider petitioner's claim, and the state appellate courts affirmed that ruling. The petitioner then sought habeas corpus relief in the federal courts and obtained an order from the United States Court of Appeals for the Sixth Circuit, directing the local United States District Court to hold a hearing on the merits of his claim. The United States Supreme Court granted Ohio's petition for certiorari and reversed, holding that Alabama's extradition demand must be honored and that petitioner's constitutional claim was properly raised in Alabama courts alone:

> "By a resort to a form of 'self-help' respondent has changed his status from that of a prisoner of Alabama to that of a fugitive from Alabama. But this should not affect the authority of the Alabama courts to determine the validity of his imprisonment in Alabama. The scheme of interstate rendition, as set forth in both the Constitution and the statutes which Congress has enacted to implement the Constitution, contemplates the prompt return of a fugitive from justice as soon as the state from which he fled demands him; these provisions do not contemplate an appearance by Alabama in respondent's asylum to defend against the claimed abuses of its prison system. *Considerations fundamental to our federal system require that the prisoner test the claimed unconstitutionality of his treatment by Alabama in the courts of that State . . . where all parties may be heard, where all pertinent testimony will be readily available and where suitable relief, if any is necessary, may be fashioned.*" *Id.* at 89–90, 73 S.Ct. at 140–41 (Emphasis added)

Similarly, in *Pierce v. Creecy*, 210 U.S. 387, 28 S.Ct. 714, 52 L.Ed. 1113 (1908), the petitioner contested Texas' attempt to extradite him from Missouri. Texas' demand for extradition was accompanied by an indictment charging the fugitive with the offense of "false swearing" or perjury. Petitioner argued that the statement of facts contained in the indictment did not describe the commission of a criminal offense. Though the indictment showed that there was probable cause to believe the defendant had committed the acts alleged in the indictment, since these acts allegedly were not criminal in nature, the petitioner's claim amounted to the contention that there was no probable cause to believe he had committed a crime. But the Supreme Court held that Missouri courts should not address the issue of the sufficiency of the Texas indictment, saying:

> "[T]he Constitution does not require, as an indispensable prerequisite to interstate extradition, that there should be a good indictment, or even an indictment of any kind. It requires nothing more than a charge of crime. . . ." *Id.* at 403, 28 S.Ct. at 719.

> "[T]he indictment, in order to constitute a sufficient charge of crime to warrant interstate extradition need show no more than that the accused was substantially charged with crime. . . . If more were required it would impose upon courts, in the trial of writs of habeas corpus, the duty of a critical examination of the laws of States with whose jurisprudence and criminal procedure they can have only a general acquaintance. Such a duty would be an intolerable burden, certain to lead to errors in decision, irritable to the just pride of the States and fruitful of miscarriages of justice. The duty ought not to be assumed unless it is

plainly required by the Constitution, and, in our opinion, there is nothing in the letter or spirit of that instrument which requires or permits its performance." *Id.* at 405, 28 S.Ct. at 720.

To sum up, considerations of comity and efficiency in interstate rendition proceedings alone would make it unwise for courts of asylum states to sit in judgment on the criminal procedures employed and judicial determinations made by tribunals in sister states.[16] The Fourth Amendment does not require a second, independent probable cause determination by the asylum state, after a judicial officer in another state has already made a finding of probable cause to support an arrest warrant.[17] In any event, the extradition clause of article IV forbids such a practice and mandates that fugitives be returned to the demanding state, whose courts are equally bound by the United States Constitution to enforce the requirements and limitations of the Fourth Amendment.

*Claimed Taint of Whole Extradition Proceedings by Initial Unlawful Detention*

At the habeas corpus hearing the State of Maine stipulated that Olson's initial detention after his arrest without a warrant was unlawful because the Maine District Court judge before whom he was arraigned failed to comply with 15 M.R.S.A. § 215. The District Court never determined whether Olson was the person charged with the alleged crime in another state, nor did it set a time limit on the period of Olson's incarceration pending the issuance of a rendition warrant by the Governor of Maine. Olson maintains that his incarceration from No-

vember 18, 1977 until December 21, 1977 was "an affront to the principles of governmental fair play and fundamental fairness," which has tainted the entire extradition proceeding and therefore requires that he not be delivered into the custody of Pennsylvania law enforcement officers.

We find petitioner's argument moot at this stage of the proceedings. Once a valid rendition warrant has been issued and executed, questions relating to the illegality of petitioner's prior detention are rendered moot. *Lott v. Heyd,* 315 F.2d 350 (5th Cir. 1963); *Reese v. Warden & Keeper of County Jail,* Colo., 561 P.2d 339 (1977); *People ex rel. Gummow v. Larson,* 35 Ill.2d 280, 220 N.E.2d 165 (1960); *Miller v. Warden, Baltimore City Jail,* 14 Md.App. 377, 287 A.2d 57 (1972); *People v. Doran, supra; Lombardo v. Tozer,* 264 S.W.2d 376 (Mo.App.1954).

In *People ex rel. Gummow v. Larson, supra,* the Illinois Supreme Court rejected the contention that initial detention which was illegal under the Illinois version of the Uniform Criminal Extradition Act deprived the Illinois governor of any authority to issue a subsequent lawful rendition warrant:

"The purpose of these sections of the extradition law is to prevent unreasonably lengthy periods of confinement of fugitives pending consummation of extradition proceedings by the demanding state. [Citations omitted] There is, however, no indication of any legislative intent to restrict the period within which the Governor . . . may issue his rendition warrant to the period within

---

**16.** As the United States Supreme Court observed in *Drew v. Thaw,* 235 U.S. 432, 439, 35 S.Ct. 137, 138, 59 L.Ed. 302 (1914):

"In extradition proceedings, even when, as here, a humane opportunity is afforded to test them upon habeas corpus, the purpose of the writ is not to substitute the judgment of another tribunal upon the facts or the law of the matter to be tried."

*Cf. Biddinger v. Commissioner of Police,* 245 U.S. 128, 135, 38 S.Ct. 41, 62 L.Ed. 193 (1917); *Munsey v. Clough,* 196 U.S. 364, 373, 25 S.Ct. 282, 49 L.Ed. 515 (1905).

**17.** The 1978 amendments of the Maine Uniform Criminal Extradition Act expressly require that the "formal charging instrument," such as the Pennsylvania complaint in the case at bar, be "accompanied by an arrest warrant issued upon a judicial determination of probable cause in the demanding state." 15 M.R.S.A. § 203 (Supp.1978), as amended by P.L.1978, ch. 671, § 5, eff. July 6, 1978. Those same amendments made "conclusive on the issue or probable cause" "an arrest warrant when [it is] issued upon a judicial determination of probable cause in the demanding state." *Id.,* § 215, as amended by P.L.1978, ch. 671, § 13, eff. July 6, 1978.

which the court which issues the fugitive warrant may commit the accused or require him to give bond." *Id.*, 35 Ill.2d at 282, 220 N.E.2d at 167.

 Olson argues that even if we find Governor Longley's rendition warrant lawful, the illegality of his earlier arrest and detention carries over to the subsequent lawful rendition warrant and taints the entire extradition proceeding. But it is a well-settled rule of criminal procedure that once a defendant is brought within the jurisdiction of a court, previous irregularities in the manner in which he was taken into custody do not render the court's jurisdiction vulnerable to a due process attack. *Cf. Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *State v. Stone*, Me., 294 A.2d 683 (1972). Since the jurisdiction of Maine to extradite Olson to Pennsylvania now rests on the Governor's rendition warrant, which was executed on January 23, 1978, previous irregularities in Olson's detention from November 18, 1977 until December 21, 1977, cannot now be raised as an obstacle to his extradition.

In summary, Olson's extradition from Maine to Pennsylvania satisfies both federal constitutional standards and the applicable statutory requirements of the Uniform Criminal Extradition Act. The entry must be:

Appeal denied.

Judgment affirmed.

POMEROY and NICHOLS, JJ., did not sit.